## RAND v. UNITED STATES.

Circuit Court of Appeals, First Circuit.
November 19, 1927.

No. 2101.

1. **Conspiracy ☞48—Evidence of conspiracy to violate Prohibition Act held for jury (National Prohibition Act [27 USCA]).**

Evidence of conspiracy to violate the National Prohibition Act (27 USCA) held sufficient to take the case to the jury.

2. **Criminal law ☞823(1)—Statement in instruction that defendant "has not seen fit to take the witness stand in his own behalf" held not prejudicial, in view of further charge.**

Language used by the court in instructions, and especially statement that defendant "has not seen fit to take the witness stand in his own behalf," held not prejudicial error, where the jury were further charged that it was his privilege, and that they should not draw any inference against him because of the fact.

In Error to the District Court of the United States for the District of Rhode Island; George F. Morris, Judge.

Sigmund Rand was convicted of conspiracy to violate the National Prohibition Act, and he brings error. Affirmed.

William H. Lewis, of Boston, Mass. (Matthew L. McGrath, of Boston, Mass., and John L. Curran, of Providence, R. I., on the brief), for plaintiff in error.

Fred B. Perkins, Asst. U. S. Atty., of Providence, R. I. (John S. Murdock, U. S. Atty., and Russell P. Jones, both of Providence, R. I., on the brief), for the United States.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. The plaintiff in error, for convenience hereinafter called the defendant, was indicted in the United States District Court for the District of Rhode Island, with 14 others, for conspiracy to violate the National Prohibition Act (27 USCA). The indictment contained three counts; the first charging conspiracy to violate the National Prohibition Act, the second to violate section 39 of the Criminal Code (18 USCA § 91), and the third to defraud the United States of customs duties. A demurrer was filed to the indictment, which was overruled.

The defendant, together with Dewey M. Parker and Weibe Reitsma, alias Dutch Reizman, was placed upon trial before Hon. Arthur L. Brown, United States District Judge, and a jury. Trial resulted in a disagreement of the jury as to defendants Rand

and Parker upon the first and second counts of the indictment, a verdict of not guilty as to each of the defendants upon count 3, and a verdict of not guilty upon all counts as to defendant Reitsma, and he was discharged.

Thereafter a second trial was called, and defendants Sigmund Rand and Sam Goldberg, alias Sam Doe, alias Abraham Horowitz, were placed upon trial before Hon. George F. Morris, United States District Judge, and a jury. The defendant Goldberg, alias Horowitz, filed a plea of misnomer, and upon motion he was discharged at the close of the evidence.

Of the original defendants indicted with Rand, Emerson, Parker, Bjorkgren, and Gould, members of the Coast Guard, pleaded guilty; Dewey M. Parker defaulted his bail; Reitsma was acquitted at the first trial on all the counts in the indictment; and the defendants Stover, Pollarmen, Hands, White, and Bush were never apprehended. Ross, another defendant, was apprehended, but defaulted his bail at the time of the first trial.

At the second trial Rand was the only defendant placed upon trial. Against him the jury returned a verdict of guilty upon count 1 of the indictment, and not guilty upon count 2, and he was sentenced to pay a fine of $5,000 and to be imprisoned for the term of two years.

Of the errors assigned those insisted upon in argument before this court were the ruling of the judge, at the close of all the evidence, denying the motion of the defendant to direct a verdict in his favor; the instruction of the court in regard to criticisms of the district attorney's office and other government officials; the refusal of the court to instruct the jury in the language requested as to the presumption of innocence of the defendant and his failure to testify; the instruction given that "the gist of this charge is conspiracy, agreeing with somebody else, so that, if you should find in this case that Mr. Rand alone was unlawfully importing, transporting, or possessing large quantities of liquor, then your verdict must be 'not guilty'"; also the refusal of the court to dismiss the jury from further consideration of the case.

A concise statement of uncontradicted facts as disclosed by the evidence will assist materially in the consideration of the questions raised by these assignments of error. In March, 1925, the defendant met one William S. Rhoades at the Grand Central Station in New York City. Rhoades was the owner of a yacht named the Hornet, which at that time was under repair at Morris Heights, N. Y., in the yard of the Consolidated Shipbuilding Corporation. Rhoades talked with Rand about the suitability of the yacht to carry cargoes of liquor into Narragansett Bay and land same in that vicinity, and agreed with Rand that, if he would advance sufficient money to pay the claim of the shipyard against her for repairs, he would take the yacht to Narragansett Bay under her own steam, and deliver her wherever directed, and allow her to work carrying liquor from ships offshore to some landing, for which he was to be paid a certain price per case of liquor, and agreed that Rand retain a certain percentage of this payment at the end of each trip to reimburse him for the amount of money he had advanced to pay the bill for repairs. The claim of the Consolidated Shipbuilding Corporation was $4,800. Rand sent down $2,000 on March 21 towards its payment, leaving a balance of $2,800, which he paid by a check for $1,500 and $1,300 in cash. The yacht was delivered at Fall River, Mass., in the latter part of March of the same year, manned by a crew which Rhoades had hired. In April, 1925, Rhoades saw Rand several times in Providence, R. I., and received from him money advanced to pay the crew.

The yacht attempted to land its first cargo of liquor on the night of April 18, 1925, with Rand aboard. On this trip the Hornet was stopped by a Coast Guard vessel, No. 231, whose captain sent two men aboard to demand of Rand the payment of the sum of $5,000 under the penalty of capture. Upon payment of $2,500 the Hornet was allowed to proceed to its destination at Rocky Point and unload a cargo of 500 cases of alcohol, which were taken by automobiles to the barn of Charles Reitsma. Later Rand paid $2,500 to Capt. Parker of the Coast Guard vessel, who retained part of the money paid him and divided the balance among his crew. Rhoades later saw Rand, on April 20 following, and Rand told him that he had been under great expense and could not pay him in full for the trip that had been made, because he had already paid $2,500 to the Coast Guard, and had got to go to New London to meet Capt. Parker and pay him an additional $2,500, and Rand paid him at that time money enough to pay the crew and outstanding bills. After this first trip, arrangements were made for a subsequent one, upon which the yacht was seized and towed into New London.

The evidence was uncontradicted that Rand was on the Hornet when she brought in the cargo of alcohol to Rocky Point, and

was present when it was loaded aboard automobiles to be conveyed to the barn of Charles Reitsma.

[1] It is strenuously contended by counsel that there was no evidence of a conspiracy— that Rand might have been guilty of transportation and possession of intoxicating liquor, but that there was no evidence upon which he could be convicted of conspiring to violate the National Prohibition Act.

He was indicted for conspiring, not only with the persons named in the indictment, most of them being members of the crews of the Coast Guard vessel and of the Hornet, but also of conspiring with other persons to the grand jury unknown. The evidence is plenary that he did conspire with the owner of the Hornet, and also with the two members at least of the Coast Guard crew who came aboard the Hornet, to transport the liquors with which the Hornet was loaded to Rocky Point. Whatever the inducement offered to these two members of the Coast Guard, it is clear that they did conspire with the defendant Rand to have the cargo of liquor on the Hornet landed at Rocky Point. The jury found that the defendant was not guilty under the second count of an attempt to bribe officers of the government; but, whether the members of the Coast Guard crew were bribed or not, the evidence is plenary that they were guilty of conspiring with the defendant Rand to land the liquor with which the Hornet was loaded. The overt act necessary to be shown to sustain the charge of conspiracy was shown in great detail. There was, therefore, no error in refusing to instruct the jury to return a verdict for the defendant, or in that portion of the charge relating to conspiracy.

That portion of the charge relating to criticism of the district attorney's office and other government officials, to which exception was taken and error assigned, is as follows:

"Criticism has been made of the district attorney's office and other government officials, upon whom is imposed the duty of bringing to justice those who are guilty of crime against the government. The district attorney's office is not on trial. No government official is on trial here. The court resents any implication of dishonesty or unofficial conduct on their part, and, further, I will say that in the argument we have heard the names 'grafters,' 'crooks,' 'perjurers,' 'traitors,' 'curs,' 'skunks,' and 'rats' used with very frequent repetition. Of course, the jury will distinguish between logical arguments founded upon the evidence and the mere repetition of opprobrious names. So

far as the argument of counsel on either side is founded upon the evidence and reason, and appeals to your judgment, you should give it fair consideration. So far as it is specious, and not founded on the evidence in the case, you should disregard it."

This was followed by an instruction that the jury were the sole judges of the facts, and that they were to eliminate from their minds any impression that any opinion expressed by the court was binding upon them. After the charge, counsel at the bench, before the jury had retired, requested an exception to that portion of the charge "in which your honor stated that you resented the imputation upon agents or attorneys of the United States," and the reply of the court, as follows: "I do, and I think the jury will, too. That is my view of it—that I ought to resent it. It is entirely uncalled for, and the worst thing that I ever heard in the argument of counsel, and if you were in New Hampshire there would be trouble about it, too." This language was addressed to counsel who were standing at the judge's bench and at such a distance from the jury that it is contended in argument it could not have been heard by them; but, if it was, the court in the following statement made it plain that it should not be considered: "I have made no statement in talking to counsel that the jury should consider." Even if some of the jurymen heard the statement to counsel, we think this instruction sufficiently protected the rights of the defendant.

[2] It is further assigned as error that the judge refused to give the following instruction:

"No inference of guilt of any defendant arises from the fact that such defendant has not taken the stand to subject himself to examination and cross-examination, and the presumption of innocence of such defendant is not removed by his failure to take the stand and testify in this case."

While the court did not give this instruction in the language in which it was couched, he substantially gave it in the following:

"Rand, the only one now on trial before you, has not seen fit to take the witness stand in his own behalf. That, of course, is his privilege, as the burden is upon the government to prove him guilty, and not on him to prove himself not guilty. You should not draw any adverse inference against him, because he has not taken the witness stand in his own behalf."

It is claimed that the statement, "the defendant has not seen fit to take the witness stand," was an implied criticism of his failure to do so, and it is assigned as error. We

do not believe that the jury understood that this expression contained any implied criticism of the defendant's course, and the further statement of the court that it was the defendant's privilege not to take the witness stand, that the burden was on the government to prove him guilty, and that no adverse inference should be drawn against him because he had not testified, entirely removed the effect of any such implied criticism, if such there was.

The jury retired at 3:45 p. m., upon Friday, December 10, 1926. They had not reached a verdict at 10:20 a. m. upon the following day, and upon being called to the courtroom the judge inquired if there were any instructions that were desired upon either count in the indictment, and then stated: "If there is nothing that the court can do to assist you in reaching a verdict by giving you any further instructions as to law, I ask that you retire again to your jury room, and that you give the matter a thorough and careful discussion, and see if you can't iron out all differences and reach a verdict in this case one way or the other." The failure of the court to discharge the jury, and this instruction, are assigned as error. The colloquialism used by the judge, "see if you can't iron out all differences," did not call upon any member of the panel to surrender his convictions in regard to any testimony in the case, but only to give all the testimony a thorough and careful discussion, and see if his interpretation of it might not be brought in accord with that of the other members of the panel. The expression is a common one, and we think the jury were not misled into the belief that it called upon any member to surrender his honest convictions. Whether the jury should have been discharged or not was largely within the discretion of the presiding judge, and the record does not disclose any abuse of this discretion.

Many of the errors assigned were waived, and those that were argued and have not been discussed disclose no error.

The judgment of the District Court is affirmed.